## United States Bankruptcy Court, Northern District of Illinois

| Name of Assigned Judge | Manuel Barbosa | CASE NO. | 08-B-09210 |
|---|---|---|---|
| **DATE** | June 3, 2010 | **ADVERSARY NO.** | 08-A-00568 |
| **CASE TITLE** | Augustine Fredrick Rodriguez and Nicole Therese Rodriguez, Debtors  Sam Caniglia, individually and derivatively on behalf of Performance Floor Care, LLC an Illinois limited liability company, and Michael Pasquini, individually and derivatively on behalf of Performance Floor Care, LLC, an Illinois limited liability company, Plaintiffs  v.  Augustine Fredrick Rodriguez and Nicole Therese Rodriguez, Defendants. | | |

**DOCKET ENTRY TEXT**

For the reasons set forth below, the Court finds in favor of the Defendants on all counts.

■[ For further details see text below.]

Like Tom Sawyer tricking his friends into paying him for the 'privilege' of whitewashing a fence for him, plaintiff Mike Pasquini essentially tricked the defendant Augustine Rodriguez into cosigning on a $65,000 home equity loan that Mr. Pasquini took out for himself, as well as agreeing to make the monthly interest payments and principal payments on that loan, all for the 'privilege' of doing Mr. Pasquini's job for him for over a year. This was in addition to Augustine's own job at the company, and for an effective aggregate *decrease* in salary as 'compensation' for the extra duties. If that were not enough, Mr. Pasquini and his co-Plaintiff Sam Caniglia now seek to find Mr. Rodriguez's $65,000 obligation non-dischargeable, as well as several other related claims. The facts in this case seem more ripe for claims by the Defendants against the Plaintiffs than the other way around, but the Defendants' financial difficulty and bankruptcy has forced them to defend themselves *pro se*. The Plaintiffs may have one or more claims against the Defendants, but none of such claims are non-dischargeable, and so the Court will find in favor on the Defendants on all counts.

## FINDINGS OF FACT

Plaintiffs, Sam Caniglia and Michael Pasquini, were the co-owners and founders of a now-defunct flooring business called Performance Floor Care, LLC, an Illinois limited liability company ("Performance" or "the Company"). Mr. Caniglia and Mr. Pasquini formed Performance in early 2005, and the Company was voluntarily dissolved on January 3, 2008.

Defendant Augustine Rodriguez knew Mr. Pasquini through Augustine's aunt, with whom Mr. Pasquini was in a relationship for about seven years. Augustine and Mr. Pasquini had met at various family gatherings. Mr. Pasquini had a favorable impression of Augustine, and when he formed Performance he thought of Augustine to work there. In late 2005, Mr. Pasquini called Augustine and offered him a job at Performance. At the time, Augustine was a manager at a carpet cleaning business that he had worked at for about 3-½ years, but after several discussions with Mr. Pasquini, he decided to take the new job. It was a 40-hour per week job with a $640 per week salary. He learned the flooring business, worked hard, and by 2006 he was the foreman in charge of all aspects of organizing and operating the construction and installation projects for Performance.

In October 2006, Mr. Pasquini offered Augustine the opportunity to buy into the company. Mr. Pasquini offered to sell half of his membership interest in Performance to Augustine in return for an upfront purchase price of $65,000. Mr. Pasquini signed a written purchase agreement with Augustine and his wife, Nicole, as well as Sam Caniglia, on behalf of Performance, on October 27, 2006 (the "Purchase Agreement"), by which Mr. Pasquini agreed to sell 250 of his 500 shares in Performance to Augustine and Nicole in exchange for a payment of $65,000 on or before October 30, 2006. Mr. Pasquini and Mr. Caniglia also signed a unanimous consent to the transfer, as the sole members of the Company.

The Rodriguezes felt like Mr. Pasquini was family, and they trusted him when he said that the shares were worth $65,000. They did not have legal representation, and did not see any financial information on the Company before agreeing to the investment. In retrospect, it was a very bad investment. They never received any distribution from the Company, even when it was dissolved in early 2008. It is unclear whether Mr. Pasquini actually thought the shares were worth that much at the time – whether he was overly optimistic about

his company or whether he consciously took advantage of the young Rodriguezes. October 2006 was at the tail-end of a real estate boom, and just before the market crashed. But, at the same time, if Mr. Pasquini truly thought the shares were worth $65,000, it is unclear where he came up with that number. When Augustine later told Mr. Caniglia how much he had paid for the shares, Mr. Caniglia seemed surprised and asked where the number came from. Mr. Pasquini told Augustine that he derived the purchase price from the value of the equipment owned by the Company. The Plaintiffs submitted as an exhibit what is purportedly a balance sheet for Performance as of October 27, 2006. (Pls.' Supplemental Ex. 3). The balance sheet lists a value of $141,825 for fixed assets, consisting of equipment and a truck. This balance sheet does list total assets of $489,110 and total liabilities of $136,831. But, the Court has deep concerns about the accuracy of the exhibit. Based on testimony at trial, the prior bookkeeper was fired in October 2006, and there were allegations about her competency and honesty. The prior bookkeeper did not turn over the accounting files for over four months, and when they were handed over were "a complete catastrophic mess." (Trial Tr. 6, Apr. 23, 2010). Additionally, the balance sheet suspiciously lists $187,000, or nearly half the Company's purported assets, as "Undeposited Funds," casting some doubt on its accuracy. Also, while Augustine might have had some estimation of the equipment and assets of the Company, since he worked there for almost a year before the investment, the Rodriguezes were shocked when they discovered four months after the investment that the Company had over $100,000 in debt.

Mr. Pasquini knew that the Rodriguezes did not have $65,000 and that they did not have good enough credit to get a loan for the purchase price. Mr. Pasquini helped Augustine obtain financing for the purchase by taking out a loan from National City Bank in his own name and mortgaging his own house, and having Augustine cosign the promissory note. In fact, Mr. Pasquini offered to help them get more financing than they needed for the purchase. The loan Mr. Pasquini took out was for $70,000, and Mr. Pasquini offered to lend the Rodriguezes the extra $5,000. At the closing of the loan, National City Bank deposited the $70,000 proceeds of the loan into Mr. Pasquini's personal account at the bank. Either at the closing or at a later time, Mr. Pasquini advanced the additional $5,000 to the Rodriguezes. The understanding between Mr. Pasquini and the Rodriguezes was that the $65,000 in proceeds of the loan constituted the purchase price under the Purchase Agreement, and that the Rodriguezes would repay the full $70,000 loan with interest. It does not appear that there was any written agreement or promissory note documenting this arrangement between Mr. Pasquini and the Defendants, other than that Augustine signed the promissory note from National City Bank to Mr. Pasquini as a co-signer.

If the membership interests were truly worth $65,000, it might be seen as admirable that Mr. Pasquini helped the Rodriguezes obtain financing for the purchase, especially because he was jointly liable on the debt and his house was put up as collateral for the loan. But, it appears that the membership interests were worth much less than $65,000, and were never even transferred to the Rodriguezes. Therefore, all the Rodriguezes really got out of the transaction was the debt obligations. The proceeds of the loan went to Mr. Pasquini (other than the $5,000 loan to the Rodriguezes), the Rodriguezes never received the membership interests or any distributions in respect of the interests, and the Rodriguezes made the interest payments on the loan until they filed for bankruptcy. Rather than a favor for a family friend, a more accurate description of the transaction was that Mr. Pasquini took out his own home equity loan, got the Rodriguezes to pay the interest on the loan for

nearly a year, and got the Rodriguezes to guaranty the loan, which obligation he now wants to be declared nondischargeable.

Although the Rodriguezes paid the purchase price for the membership interests, there is some dispute over whether they were ever actually transferred to the Rodriguezes. The Purchase Agreement stated that Mr. Pasquini

> "hereby assign[s] *and quit claims* to Augustine and Nicole, as joint tenants, all right, title and interest he has in 250 of his 500 units in Performance. The parties agree to execute any and all documents necessary to effect the foregoing assignment and quitclaim."

(Pls.' Supplemental Ex. 2). The agreement did not include any conditions precedent for the transfer. However, even though the membership interests in the Company were represented by certificates, a certificate was never transferred to the Rodriguezes, nor was a certificate ever issued in their name. The Plaintiffs have also stated, in a letter dated August 31, 2007 (the "August 2007 Letter"), from the Plaintiffs' counsel to the Defendants, that the membership units purportedly transferred to the Rodriguezes "have always been, and shall remain, registered in the name of Mr. Pasquini on the Company's ledger." (Pls.' Supplemental Ex. 5). In the August 2007 Letter, the Plaintiffs alleged that the Defendants had failed to pay the $65,000 purchase price for the membership interest and the Plaintiffs purported to terminate the Rodriguezes' "potential rights as a transferee" under the Purchase Agreement and "rights to participate in the management and operation of the Company." Id. The $65,000 purchase price was the only item listed in paragraph 3 of the Purchase Agreement, entitled "Consideration." But, a 4th paragraph was entitled "Additional Consideration," and stated:

> Augustine agrees that a part of his duties as a member of Performance, includes running crews, and on job site as foreman on jobs both local and long distance Nicole agrees that a part of her duties as a member of Performance she will be the office manager responsible for billing and incoming and outgoing checks; interviewing potential employees; finding new work. Nicole will also be responsible for learning the current management system and making recommendations for its improvement. Augustine and Nicole further agree that a part of his or her duties as a member of Performance, each will give an accounting of day-to-day operations to the other members, and will work closely with the members and will take no action in the name of Performance without the consent of the other members consistent with the Operating Agreement [sic].

(Pls.' Supplemental Ex. 2). It is unclear what the meaning of the paragraph is. The Plaintiffs argue that the paragraph was a condition precedent, or at least a condition subsequent to the transfer of the membership interest, and that if the Rodriguezes ever ceased working for the Company, they would forfeit their membership interest and be liable for damages, including the value of their unperformed work and any consequential damages. However, the paragraph is not phrased as a condition precedent or condition subsequent, and the paragraph includes no timeframe during which the duties will last. Moreover, the parties acknowledge that there were separate employment agreements with each of Mr. Rodriguez and Mrs. Rodriguez, though they were oral agreements. The Court believes that the provision merely clarifies that, in their capacity as members of the

4 of 10

Company, the Rodriguezes might have additional duties above and beyond their duties under their employment contracts, but that the Rodriguezes would have no right to additional compensation for such duties other than their right to receive distributions under the Operating Agreement. The oral employment agreement with Augustine was that he would receive $640 per week as compensation for working 40 hours per week as a foreman. In October 2006, the parties agreed to increase Augustine's salary as foreman to $750 per week. However, because he also had to make interest payments of $508.09 per month to or on behalf of Mr. Pasquini, the net effect was a *decrease* in salary of almost $10 per week. Moreover, rather than working 40 hours per week, after the investment Augustine frequently had to work as much as 72 hours per week. Mr. Pasquini testified that he sold his shares to Augustine in part because Mr. Pasquini was raising a young son, and did not want to travel anymore. He wanted Augustine to be in charge of all of the out-of-state work, and for his own active role in the Company to diminish. (Trial Tr. 70-72, Apr. 22, 2010). Mr. Pasquini also stated that "when you own a company, it's not a matter of hours ... when you owned a company, you're the guy responsible for it." Id. In other words, in addition to the investment of $65,000, Mr. Pasquini expected Augustine to take on significant additional responsibilities and work significantly more hours. Meanwhile, the Rodriguezes never received a distribution on the membership interest that they purportedly purchased, the Plaintiffs never documented the transfer of the membership interests and the Plaintiffs subsequently alleged that the membership interests were in fact never transferred to the Defendants.

At the time the Purchase Agreement was signed in October 2006, the parties agreed to hire Nicole as a bookkeeper for the Company. Mr. Caniglia testified that it was agreed that Nicole would be paid "$100 per week because we didn't have money to pay any more than that." (Trial Tr. 20, Apr. 22, 2010). However, there was no express agreement on how many hours she would be required or expected to work. The prior bookkeeper, Janee, was fired in October 2006 by the joint agreement of Mr. Pasquini and Mr. Caniglia, with Nicole coming in as her replacement. Mr. Pasquini stated that the reason for firing her was that it would be cheaper to have Nicole do the work. As Mr. Pasquini testified, "I figured we were getting a two for one" by having Augustine take over management and Nicole take over bookkeeping. (Trial Tr. 76, Apr. 22, 2010). It was a way to capitalize on family relationships to cut down on costs. As Mr. Pasquini's testified, "That was our agreement, and that's why it was all good; I was with [Augustine's] aunt, and one big happy family at the time." Id. However, Augustine also testified that Mr. Pasquini had told him multiple times about his concerns that Janee and Sam had somehow maneuvered money around. Mr. Pasquini paid little attention to the finances of the Company, particularly after October 2006, and apparently wanted someone loyal watching over the books. Once Nicole started working, she tried to cut down on what she viewed as Mr. Caniglia's excessive expenses while he was with the crew on jobs.

The initial agreement was to pay Nicole an amount such that she received $100 per week as take home pay after taxes and other deductions. She was paid that amount until February 2007, at which point her paychecks, signed by herself on behalf of the Company, were increased to $200. These paychecks continued through August 2007. Both Mr. Pasquini and Mr. Caniglia testified that they never authorized increasing Nicole's salary, but the Court does not find their testimony credible. Mr. Caniglia admitted that $200 per week would have been a fair salary for the work that Nicole did. Mr. Pasquini's testimony indicated that he realized that $100 per week was too low (which he characterized as a mere "give-me that Sam probably offered.") (Trial

Tr. 76, Apr. 22, 2010). Initially, Nicole only agreed to do the work for that salary on the assumption that she and her husband would share in the profits of the Company through their membership interests. But, the evidence demonstrated that both Mr. Caniglia and Mr. Pasquini knew or should have known at the time Nicole agreed to work for the Company that, based on the finances of the Company, there was no reasonable likelihood that the Rodriguezes would ever receive a positive distribution from the Company. This fact was hidden from the Rodriguezes for over four months, until the accounting books were finally turned over to Nicole. It appears that the membership interest was used as a bait to get Nicole and Augustine to work more, which the Plaintiffs snapped back by never transferring. She might have held on with the hopes of a future distribution until she saw the true state of the Company's finances, but then must have realized there was no likelihood of a profit distribution anytime soon, if ever. The Rodriguezes went to Mr. Pasquini, and asked him to purchase back his shares for $65,000, but he refused. Nicole then asked for a raise in her salary at one of the meetings of the members. Mr. Caniglia admitted that a raise for Nicole was discussed, but denied that it was ever approved. (Trial Tr. 49, Apr. 22, 2010). However, the Court does not find the Plaintiffs' testimony credible that the raise was never approved. The evidence demonstrates that both Mr. Caniglia and Mr. Pasquini realized that Nicole's salary of $100 was too low. Mr. Caniglia admitted that raising her salary was discussed and that Nicole said she would have to find other work if she was not given the raise. After that meeting, Nicole did not find other work and began writing $200 checks instead of $100. Perhaps Mr. Caniglia and Mr. Pasquini did not formally approve her raise, but the Court believes that one or more of the Plaintiffs at least gave Nicole the impression that the raise was approved in order to keep her and Augustine working for the Company. The employment contract was an oral contract, and thus there was no reason to expect a written agreement was necessary to modify it. And, while the Operating Agreement might have technically required the consent of all members, the evidence suggests that numerous business decisions of the Company were made by Mr. Caniglia or Mr. Pasquini alone, notwithstanding the requirements of the agreement. In contrast to the assertion that she was embezzling or stealing from the Company, there was no indication that she tried to hide or cover the increased amounts of disbursements, and the evidence demonstrates that $200 was not an unreasonable salary for the work she did.

When Nicole received the QuickBook files in January 2007, they were a "complete catastrophic mess." (Trial Tr. 6, Apr. 23, 2010). Assets were not entered properly, no bank statements had ever been reconciled, and depreciation was not calculated correctly. Complicating matters was that Nicole was not familiar with the QuickBooks software. She had a degree in business management, and might have been able to handle the books if they had been set up and maintained properly beforehand, but found herself unable to fix the problems on her own. However, she took a two-day QuickBooks seminar, and was able to reconcile the bank statements and get the books up-to-date. In February 2006, she learned that the 2005 taxes were done incorrectly, so in 2006, they had Mueller & Company, LLP do the taxes. Working with the people at Mueller, Nicole was able to fix other errors in the bookkeeping and get the books correct through 2006.

By June 2007, the Company was in a dire financial condition. Augustine struggled to find new projects for the Company, and beginning in June 2007, the Company had insufficient cash to make payroll and other expenses. On numerous occasions after June 2007, the Company's account was overdrawn to make payroll expenses. There was some indication that on one or more occasions the Defendants were asked by Mr. Caniglia

or Mr. Pasquini not to cash payroll checks, in order to avoid overdrawing the accounts. On June 29 and August 10, 2007, the payroll check to Augustine, which was drawn by Nicole on behalf of the Company, included an extra $510. The payroll stubs for these two checks had a memo that the addition was for "commissions for loan." Apparently, Augustine had contacted Mr. Pasquini, and told him that he did not have enough money to make the interest payments on the loan from National City Bank. Not wanting to risk defaulting on the mortgage for his house, Mr. Pasquini told Augustine to add an additional $510 to his next paycheck from the Company. Nicole disclosed the payment by noting it on the payroll stub, and the Court believes that the parties intended it as a salary advance.

By August 2007, the stress on the Rodriguezes was enormous. Nicole was 8 or 9 months pregnant, and Augustine was working over 70 hours per week on a project in Kalamazoo, Michigan. Mr. Pasquini had ceased taking an active role in the Company after October 2006, and by August 2007, Augustine felt that Mr. Caniglia had also abandoned the Company. The real estate market was crashing and Mr. Caniglia had found another job. The Rodriguezes had already tried to get out of the Company in January or February, by asking Mr. Pasquini to repurchase his shares, but he had refused. Augustine felt trapped alone on a sinking ship, and eventually decided to quit. He walked off the Michigan job and told Mr. Pasquini he was quitting. Because he walked off the job, Performance was unable to complete the Michigan job. Mr. Caniglia testified that Performance lost between $18,000 and $20,000 by not completing the project, though it was unclear what portion of this was lost profit as opposed to costs incurred. After Augustine walked off the job, Mr. Pasquini and Mr. Caniglia fired Nicole. The Plaintiffs allege that she had done a poor job of maintaining the books and that they had to pay an accounting agency $1,070 to correct the books after she was gone.

## CONCLUSIONS OF LAW

Under Section 523(a) of the Bankruptcy Code, a discharge in bankruptcy does not discharge a debt:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
    (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; [or]
(6) for willful and malicious injury by the debtor to another entity or to the property of another entity....

11 U.S.C.A. § 523(a) (West 2010). The party opposing discharge bears the burden of proving by a preponderance of the evidence that the debt falls within the ambit of Section 523(a). Here, the Plaintiffs have not demonstrated that any debts owed to them by the Defendants are non-dischargeable.

A.     The Loan Proceeds and Membership Interest.

In order for a creditor to receive an exception from discharge under Section 523(a)(2)(A), "a creditor must show that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." Ojeda v. Goldberg, 599 F.3d 712, 716-17 (7th Cir. Mar. 25, 2010). The Plaintiffs argue that the Defendants obtained either the membership interests in the Company or the proceeds of the $70,000 loan from Mr. Pasquini through false pretenses, false representation, or actual fraud.

National City Bank lent Mr. Pasquini $70,000, Mr. Pasquini lent the Defendants $70,000, and the Defendants paid Mr. Pasquini $65,000 to purchase the membership interests in the Company. However, the Plaintiffs have not identified any false pretense, representation or fraudulent act committed by the Defendants. The facts demonstrate that it was Mr. Pasquini who suggested the purchase price for the membership interests and it was Mr. Pasquini who suggested financing the purchase through a home equity loan from National City Bank secured by Mr. Pasquini's home. It was Mr. Pasquini who had access to the financial information regarding the Company, and Mr. Pasquini who had a relationship with National City Bank. Mr. Pasquini was Augustine's boss, and almost like an uncle to him. The Defendants trusted and relied on Mr. Pasquini, not the other way around. The Plaintiffs want to argue that the Defendants mislead Mr. Pasquini about their ability or intent to repay the loan. But, Mr. Pasquini knew that the Defendants did not have $65,000, and he knew that they did not have the credit available to obtain financing. In fact, Mr. Pasquini restructured Augustine's employment contract to provide a source of income for the monthly interest payments. Therefore, even if the Defendants somehow falsely implied that they could afford to repay the loan, Mr. Pasquini could not justifiably rely on such a representation or pretense. Moreover, the evidence demonstrated that the Defendants did make the required interest payments on the loan for over a year, before they ultimately were forced to file for bankruptcy.

The Plaintiffs' argument is further weakened since they allege that the membership interest was never in fact transferred to the Defendants. If the $65,000 loan proceeds went directly to Mr. Pasquini and the membership interests were never transferred, then neither the funds nor the interests were 'obtained' by the Defendants for purposes of Section 523(a)(2). It is true that Mr. Pasquini loaned $5,000 to the Defendants, which they did receive. But, as discussed above, there was no evidence of fraud or misrepresentation by the Defendants in obtaining such loan.

B.     The Unauthorized Payments by Nicole on Behalf of the Company

When Nicole signed checks on behalf of the Company, she acted in a fiduciary capacity on behalf of the Company. The Plaintiffs argue that by making unauthorized payments to herself of $200 per week instead of $100 per week, and by making two unauthorized payments of $510 to Augustine, which he used to make the interest payments on the loan from Mr. Pasquini, Nicole committed defalcation or embezzlement.

"Defalcation" is the "misappropriation of funds held in trust for another in any fiduciary capacity, and the failure to properly account for such funds." Mut. Mgmt. Servs., Inc. v. Fairgrieves (In re Fairgrieves), 426 B.R. 748, 755 (Bankr. N.D. Ill. Jan. 25, 2010). The Seventh Circuit has held that defalcation requires at least

reckless conduct. Meyer v. Rigdon, 36 F.3d 1375, 1385 (7th Cir.1994). "Embezzlement" is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." In re Weber, 892 F.2d 534, 538-39 (7th Cir.1989) (quoting Moore v. United States, 160 U.S. 268, 269, 16 S.Ct. 294, 295 (1895)). To prove embezzlement, the creditor must show by clear and convincing evidence that (1) the debtor appropriated funds for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit. Id.

Here, if not in fact authorized, Nicole at least believed that she had been authorized to make the payments. After making the request for a raise at one of the meetings of the members, she thought her request had been granted. The original employment agreement was an oral agreement, and so she had no expectation that a raise would have to be documented by written agreement. Similarly, Nicole thought that Mr. Pasquini had authorized the two advances of $510 in the summer of 2007 in order to make the required interest payments on the loan. It was rational for her to think that Mr. Pasquini had an interest in ensuring that the loan payments were made, because of the mortgage on his house. While actual approval might have required the consent of all members of the Company, Nicole believed that these sorts of disbursals could be approved by a single member. It was a small company, and many things were done orally or informally. Notwithstanding the language in the Operating Agreement, it was their regular practice in the Company for approvals of expenses and third party payments to be granted without a meeting of the members. Because Nicole thought that her raise and the two advances had been authorized, she did not have a fraudulent intent. And, because it was not unreasonable for her to think that she had been authorized, her acts were not reckless. Therefore, the Plaintiffs have not demonstrated that she committed either embezzlement or defalcation, even assuming *arguendo* that the payments were not authorized in fact.

C.    Damages for Breach of Duties.

Finally, the Plaintiffs argue that the damages caused by Augustine walking off the Michigan project and by Nicole's inability to properly maintain the QuickBook files should be non-dischargeable. They argue that the acts were willful and malicious injuries to the Company, causing the Company to lose $18,000 to $20,000 on the unfinished Michigan job and $1,070 in correcting the books and QuickBook files. However, both acts were at worst mere breaches of contract, not intentional torts. A breach of contract, even an intentional breach of contract, not involving tortious conduct is outside the scope of §523(a)(6). Wish Acquisition, LLC v. Salvino, No. 07-C-4756, 2008 WL 182241, at *3-4 (N.D. Ill. Jan. 18, 2008) (Zagel, J.). The evidence demonstrated that Augustine's intent in quitting was not to damage the Company. He did his best to help the Company, and thought he had a vested membership interest the same as Mr. Caniglia and Mr. Pasquini. He simply wanted to go back to his pregnant wife in Illinois and to get away from the stress of overwork and worries about the Company. Nor was injury substantially certain to result from his leaving. Others could have filled in for him. He called Mr. Pasquini to let him know that he was quitting the job, and it was possible that Mr. Pasquini or Mr. Caniglia would have taken over, or that they could have hired a new foreman or made do with their existing employees.

Nicole also did not act willfully or maliciously. There was no evidence that she intentionally damaged the Company's books. She did the best she could as bookkeeper, and even took QuickBook seminars and

sought expert help when she struggled. At worst, she acted negligently. But, injuries either negligently or recklessly inflicted do not come within the scope of § 523(a)(6). In re Burke, 398 B.R. 608, 626 (Bankr.N.D.Ill.2008) (citing Kawaauhau v. Geiger, 523 U.S. 57, 64, 118 S.Ct. 974 (1998)).

## CONCLUSION

For the foregoing reasons, the Court finds in favor of the Defendants on all counts.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

June 3, 2010

Judge Manuel Barbosa